**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | |
| FLYi, INC., et al. ) | Case Nos. 05-20011 (MFW) |
| ) | |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | Re: Docket Nos. 2130, 2176, 2284, 2314, 2328, 2381 |

**OPINION[1]**

Before the Court is the Objection of the FLYi and Independence Air Distribution Trust (the "Trust") to the claim of a former landlord, Loudoun Gateway III, L.L.C. ("Loudoun"). For the reasons stated below, the Court will sustain the objection.[2]

I.  BACKGROUND

On November 7, 2005, FLYi, Inc. ("FLYi") and several of its affiliates (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code. On January 5, 2006, the Court entered an order authorizing the Debtors to discontinue their scheduled flight operations. Since that time the Debtors have liquidated substantially all their assets.

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure which is made applicable to contested matters by Rule 9014.

[2] The Court's opinion addresses only the legal basis for the objection. The parties have agreed to a separate hearing on the amount of the claim after the legal issue is resolved.

Prior to its bankruptcy filing, FLYi was a party with Loudoun to a lease agreement dated December 7, 2000 (the "Lease") of a building located at 45200 Business Court, Dulles, Virginia (the "Premises").  On April 30, 2006, FLYi rejected the Lease.[3] On November 30, 2006, Loudoun sold the Premises to a third party.

On November 21, 2006, the Debtors filed their First Amended Joint Plan of Reorganization (the "Plan").  On March 15, 2007, the Court confirmed the Plan, which became effective on March 30, 2007.  Pursuant to the Plan, the Trust was created to liquidate the remaining assets, reconcile claims against the estate, and make the appropriate distributions to creditors.

As part of its duties, the Trust filed Omnibus Objection No. 30 (Substantive) and Motion to Reduce or Reclassify Certain Claims on March 30, 2007.  Among the claims to which the Trust objected was a claim filed by Loudoun for lease rejection damages in the amount of $2,324,324.16 pursuant to section 502(b)(6) of the Bankruptcy Code.  The basis of the Trust's objection is that Loudoun had sold the Premises, thereby eliminating any claim it might have to unpaid rent or other rejection damages arising after the sale.

A hearing was held on the Omnibus Objection as it pertained to the Loudoun claim on July 13, 2007.  At the conclusion of the hearing, the Court requested additional briefing on the effect

---

[3] Thereafter, FLYi entered into a new one-year lease with Loudoun for a small portion of the Premises.

under Virginia state law of the sale of the Premises on Loudoun's claim for damages under the Lease.  The parties agreed to defer an evidentiary hearing on the amount of the claim until after the Court's ruling on the legal issues presented.  The additional briefing was concluded on September 3, 2007.  The matter is now ripe for decision.

II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 & 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), & (O).

III. <u>DISCUSSION</u>

A.   <u>Virginia Common Law</u>

The Trust asserts that under the Lease and Virginia state law, Loudoun had three options upon the rejection of the Lease: do nothing and sue for the rent remaining under the Lease; re-enter the Premises for the sole purpose of re-letting it without terminating the Lease; or re-enter the Premises and exercise full dominion over the premises thereby terminating the Lease and eliminating FLYi's obligation to pay any future rent.  <u>See, e.g.</u>, <u>tenBraak v. Waffle Shops, Inc.</u>, 542 F.2d 919, 925 (4th Cir. 1976).  Because Loudoun sold the Premises (thereby exercising

full dominion over it), the Trust argues that Loudoun elected the third option thereby terminating the Lease.  In re Windsor, 201 B.R. 133, 137 (Bankr. D. Md. 1996) (holding under Virginia law that a landlord accepts a tenant's surrender of leased premises if the landlord exercises dominion over the premises inconsistent with the ability of the tenant to re-enter).  Consequently, the Trust contends that Loudoun lost all right to a claim for unpaid rent from FLYi arising after the sale of the Premises.

Loudoun disagrees.  It contends that the sale of the Premises did not constitute an acceptance by Loudoun of FLYi's surrender and was not a termination of the Lease.  It asserts that the Ames case is directly on point and supports its position.  See, e.g., In re Ames Dept. Stores, Inc., 173 B.R. 80, 82 (Bankr. S.D.N.Y. 1994) (concluding under Maryland law that the sale of a lease did not eliminate the landlord's rejection damages claim).

The Trust responds that under Virginia law the sale of leased property by a landlord constitutes an acceptance of the surrender of that property by the tenant thereby eliminating any claim the landlord may have to unpaid future rent.  See, e.g., Wilson v. Ruhl, 356 A.2d 544, 547 (Md. 1976) (holding under Maryland law that merely listing property for sale did not constitute a termination of the lease by the landlord but stating, in dicta, that if the property had been sold, it would

have been a termination).

The Court agrees with the Trust. "The determination of property rights under lease agreements and otherwise is governed by state law and the agreement between the parties." Windsor, 201 B.R. at 135, citing Butner v. United States, 440 U.S. 48 (1979). In this case, the parties agree that Virginia law applies and that Maryland and Virginia common law are the same on this issue.[4]

Under Virginia law, on breach of a lease by the tenant, the landlord has three options:

> In such a case, the law of Virginia allows the lessor certain options; it may re-enter and terminate the lease, it may re-enter for the limited purpose of re-letting without terminating the lease, or it may refuse to re-enter and initiate an action for accrued rents.

tenBraak, 542 F.2d at 925.

In this case, Loudoun re-entered the Premises and, therefore, did not choose the third option. The dispute is which of the first two options Loudoun chose.

Loudoun contends that the Ames case is directly on point and requires the conclusion that the sale of the Premises did not constitute a termination of the lease. The Court declines to follow the Ames case. In Ames, the Court's decision was premised on its conclusion that "[u]nder Maryland law, a breach by a

---

[4] Compare tenBraak v. Waffle Shops, Inc., 542 F.2d 919, 925 (4th Cir. 1976) with Wilson v. Ruhl, 356 A.2d 544, 546 (Md. 1976).

5

tenant entitles a landlord to damages in an amount equal to the rental for the full remaining term of the lease at the time of the breach." 173 B.R. at 82, citing Wilson, 356 A.2d 544. Had the Ames Court done a more thorough analysis of common law, it would have found that a sale of property by the landlord terminates the landlord's right to collect future rent from the breaching tenant.

> Specifically, the courts have held that under Virginia law,
>
> [T]he question of whether the landlord has accepted the debtor's surrender of the premises is heavily dependent on the facts and circumstances of the particular case.
> Acceptance of a tenant's abandonment may be discerned from express acceptance by the landlord, or through acts or conduct clearly indicating an intent to accept abandonment. . . . Courts dealing with a landlord's acceptance through implication caution that the actions of the landlord subsequent to the abandonment must be substantial enough to evidence reappropriation of the premises and an intent to foreclose any future rights of the tenant in the premises. . . . A landlord's re-entry into the premises following a breach by the lessee, by itself, generally is not sufficient to result in the lessor's acceptance of the surrender. . . . [H]owever, a landlord's re-entry into the premises and utilization of the premises for its own purposes is sufficient to constitute an implied acceptance of the tenant's abandonment thereby terminating the debtor's liability under the lease.

Windsor, 201 B.R. at 136-37 (citations omitted). In Wilson, the Court recognized that a sale of property "is so inconsistent with the tenant's estate as to allow for no other interpretation than that the landlord had reentered in order to accept a surrender." 356 A.2d at 547 (citations omitted).

6

The evidence in this case establishes that Loudoun did not re-let but sold the Premises. The Court concludes that the sale of the Premises was the exercise of sufficient dominion over the Premises to constitute the acceptance of FLYi's abandonment such that the Lease was terminated and no further rent was due by the estate. <u>Windsor</u>, 201 B.R. at 136-37; <u>Wilson</u>, 356 A.2d at 547.

    B.   <u>Lease Provisions</u>

In its Supplemental Brief, Loudoun asserts that even if Virginia common law does provide that a sale of the premises precludes the landlord from suing for future rent, the law also allows parties to contract around that result. It contends that the parties did just that in the Lease.

    1.   <u>Paragraph 21G</u>

Specifically, Loudoun points to paragraph 21G which provides that:

> Nothing herein contained shall limit or prejudice the right of Landlord to provide for and obtain as damages by reason of any such termination of this Lease or of possession an amount equal to the maximum allowed by any statute or rule of law in effect at the time when such termination takes place, whether or not such amount be greater, equal to or less than the amounts of damages which Landlord may elect to receive as set forth above.

(Lease at ¶ 21G.) Loudoun argues that this provision means that nothing in the Lease limits the total amount which would be due under law, which Loudoun argues means all future rent due under the Lease.

7

The Trust agrees with Loudoun's premise but not its conclusion.  It asserts that paragraph 21G did not create any new rights that Loudoun might have under state law, it simply states that the Lease does not reduce those rights.  Because under state law the sale of the Premises terminated the Lease, the Trust argues that Loudoun has no claims under the Lease or applicable law.

The Court agrees with the Trust's interpretation of paragraph 21G.  While Virginia law does permit the parties to contract around the common law, such provisions must be strictly construed.  In re WD Ins. Servs., Inc., No. 04-14354-SSM, 2005 Bankr. LEXIS 567, at *11 (Bankr. E.D. Va. Feb. 28, 2005).  In this case, the Court must consider paragraph 21G in context.

Paragraph 21A permits Loudoun to re-enter the premises; paragraph 21B waives any rights FLYi would have for damages by such re-entry; paragraph 21C allows Loudoun to terminate the Lease or to re-let the Premises; paragraph 21D permits Loudoun to apply any rents received from re-letting in an agreed manner; paragraph 21E permits Loudoun, if it elects not to re-enter, to sue FLYi for liquidated damages (equal to the full amount of future rents due under the Lease); and paragraph 21F provides that Loudoun's taking possession of the Premises is not a termination of the Lease unless Loudoun gives written notice to that effect or a Court decrees that it is such a termination.

8

In this context, the Court concludes that paragraph 21 is simply a reiteration of the options that Loudoun would otherwise have under Virginia common law: (1) re-enter and terminate, (2) re-enter and re-let, or (3) not re-enter but sue for all future rent due under the Lease. tenBraak, 542 F.2d at 925. As a result, the Court concludes that paragraph 21G does no more than state that the Lease is not intended to limit rights Loudoun may have under applicable law but does not create any new rights.

Loudoun also contends that the last sentence in paragraph 21G supports its claim for all future rent arising after the rejection (and even after the sale of the Premises). That sentence states:

> Notwithstanding anything to the contrary herein contained or any other rights exercised by Landlord hereunder, upon the occurrence of an Event of Default by Tenant under the terms of this Lease, rent which otherwise would be due or would have been due except for any abatement provided for in this Lease (other than in Sections 18 and/or 25) shall be immediately due and payable.

(Lease at ¶ 21G.)

The Trust disagrees, arguing that the last sentence of paragraph 21G is not an acceleration clause but merely states that rent due on breach will be the original rent set forth in the Lease, without giving force to any abatement of rent to which the parties may have previously agreed.

The Court agrees with the Trust. The last sentence of paragraph 21G is not an acceleration clause, which would make all

9

future rent due on termination of the Lease.  In fact, in describing the liquidated damages option (in the event Loudoun does not re-enter the Premises), paragraph 21E expressly states that all future rent would be due.  There is no such express language in paragraph 21G.  In contrast, the Court concludes that paragraph 21G only permits Loudoun to collect any past rent that was abated if FLYi breaches the Lease.

Therefore, the Court concludes that Paragraph 21G does not represent an agreement by the parties to modify the common law effect of Loudoun's re-entering and terminating the Lease by selling the Premises.

### 2. Paragraph 20A

The Landlord further argues that paragraph 20A of the Lease preserves its claim for all future rent even if the Landlord accepted the surrender of the Premises.  That paragraph provides in full:

> In the event that Tenant shall become a debtor under Chapter 7, 11 or 13 of the Bankruptcy Code ("Debtor") and the trustee ("Trustee") or Tenant shall elect to assume this Lease for the purpose of assigning the same or otherwise, such election and assignment may only be made if all of the terms and conditions of Sections 20.B and 20.D hereof are satisfied.  The Tenant acknowledges that it is essential to the ability of Landlord to continue servicing the mortgage on the Building that a decision on whether to assume or reject this Lease be made promptly.  Under these circumstances, Tenant agrees that should Tenant, as debtor-in-possession ("Debtor-in-Possession") or any Trustee appointed for Tenant, fail to elect to assume this Lease within sixty (60) days after the filing of the petition under the Bankruptcy Code ("Tenant's

>Petition"), this Lease shall be deemed to have been rejected.  Tenant further knowingly and voluntarily waives any right to seek additional time to affirm or reject the Lease and acknowledges that there is no cause to seek such extension.  If Tenant, as Debtor-in-Possession, or the Trustee abandons the Premises, the same shall be deemed a rejection of the Lease.  Landlord shall be entitled to at least thirty (30) days prior written notice from Tenant, as Debtor-in-Possession, or its Trustee of any intention to abandon the Premises.  At the expiration of at least thirty (30) days, <u>Landlord shall be entitled to possession of the Premises without further obligation to Tenant or the Trustee, and this Lease shall be cancelled, but Landlord's right to be compensated for damages in such liquidation proceeding shall survive</u>.

(Lease at ¶ 20A (emphasis added).)

The Trust responds that this provision does not create any new rights (or specifically modify the effect of termination of the Lease under state law).  It argues that paragraph 20A simply provides that whatever right Loudoun has to damages is not affected by the termination of the Lease.

The Court agrees with the Trust.  Paragraph 20A does not create a specific claim for damages.  It simply provides for a time within which FLYi shall assume or reject the Lease.  It then states that if the Lease is rejected or deemed rejected, Loudoun retains a right to claim damages.  It does not, however, expressly state that if the Lease is cancelled, Loudoun has a claim for a specific amount of damages or, as Loudoun asserts, for all future rents.  Instead, the other provisions of the Lease specify the amount of Loudoun's claim.  As noted above, those provisions are in accordance with Virginia common law and provide

11

that if Loudoun accepts the surrender of the Premises, FLYi has no further obligation to pay rent. (Lease at ¶¶ 21C & E.)

Even if paragraph 20A did provide for Loudoun to retain the right to collect all rent due under the Lease in the event the Lease was terminated as a result of FLYi's bankruptcy, the Trust contends that such a clause is unenforceable under section 365(e)(1) of the Bankruptcy Code. That section provides:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on -
> . . .
> (B) the commencement of a case under this title.

11 U.S.C. § 365(e)(1)(B).

The Court agrees with the Trustee. If the effect of paragraph 20A is, as Loudoun asserts, to create a right of Loudoun to full payment of future rent notwithstanding the effect of Virginia law simply because of the commencement of a bankruptcy case by FLYi, then it is not enforceable. See, e.g., In re Joshua Slocum Ltd., 922 F.2d 1081, 1090 (3d Cir. 1990) (holding that section 365 "on its face permits the court to ignore so-called ipso facto and forfeiture clauses." ); Lyons Sav. & Loan Ass'n. v. Westside Bancorporation, Inc., 828 F.2d 387, 393 n.6 (7th Cir. 1987) ("Section 365(e) of the Bankruptcy Code invalidates ipso facto or bankruptcy termination clauses

which permit one contracting party to terminate or even modify an executory contract or unexpired lease in the event of the bankruptcy of the other contracting party."); In re Chateaugay Corp., No. 92 CIV. 7054 (PKL), 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) (holding that under § 365 "[n]o default may occur pursuant to an ipso facto clause and no reliance may be placed upon an alleged default where the only cause for default is the debtor's commencement of a bankruptcy case."); In re Convenience USA, Inc., Nos. 01-81478 to 01-81489, 2003 WL 23211573, at *6 (Bankr. M.D.N.C. Dec. 9, 2003) (concluding that "[u]nder § 365(e), a clause in an executory contract providing for the termination or modification of the contract which is conditioned on the debtor's insolvency, the commencement of a bankruptcy case or the appointment of a receiver or custodian, is inoperative in a bankruptcy case.").

Consequently, the Court concludes that even if paragraph 20A did create a claim for all future rent under the Lease in the event the Lease was terminated or rejected in FLYi's bankruptcy, that clause is unenforceable under section 365(e)(1) of the Bankruptcy Code because it provides for a modification of the Lease solely because of Flyi's bankruptcy filing.

13

IV.  CONCLUSION

For the reasons stated above, the Court will sustain the objection of the Trust to the claim filed by Loudoun.  A further hearing will be scheduled to consider the amount of that claim.

An appropriate Order is attached.


Dated: October 17, 2007        BY THE COURT:


_____
Mary F. Walrath
United States Bankruptcy Judge