**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: ) | Chapter 11 |
| ) | |
| FLYi, INC., et al. ) | Case No. 05-20011 (MFW) |
| ) | |
| ) | (Jointly Administered) |
| Debtors. ) | |
| ) | Re: Docket Nos. 2130, 2176, |
| ) | 2284, 2314, 2328, 2381 |
| ) | 2432, 2433, 2473, 2494, |
| ) | 2501, 2505, 2509 |

**OPINION[1]**

Before the Court is the Objection of the FLYi and
Independence Air Distribution Trust (the "Trust") to the claim
for rejection damages of a former landlord, Loudoun Gateway III,
L.L.C. ("Loudoun").  The Court previously sustained the objection
to the extent that Loudoun claimed rent for the period after it
had sold the Premises, concluding that the sale of the Premises
constituted an acceptance of surrender of the Premises thereby
eliminating any obligation the Debtors had to pay rent under
Virginia property law.[2]  At the continued hearing to ascertain
the amount of the remaining claim, Loudoun asserted that it was
entitled to a contractual claim for consequential damages in
addition to the claim it had previously asserted for unpaid

---

[1]  This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure which is made applicable to
contested matters by Rule 9014.

[2]  In re Flyi, Inc., 377 B.R. 140, 144 (Bankr. D. Del.
2007).

future rent under the Lease.  For the reasons stated below, the
Court will schedule a further evidentiary hearing to allow
Loudoun to present evidence in support of its contract claim and
the amount of that claim.


I.    <u>BACKGROUND</u>

        The facts are recited in this Court's previous decision and
will only be summarized here.  FLYi, Inc. ("FLYi") and several of
its affiliates (collectively, the "Debtors") are debtors under
chapter 11 of the Bankruptcy Code in cases filed on November 7,
2005.  Prior to its bankruptcy filing, FLYi was a party with
Loudoun to a lease agreement dated December 7, 2000 (the "Lease")
of a building located at 45200 Business Court, Dulles, Virginia
(the "Premises").  On April 30, 2006, FLYi rejected the Lease.[3]
On November 30, 2006, Loudoun sold the Premises to a third party.

        The Trust was created under the Debtors' confirmed plan of
reorganization to liquidate the Debtors' remaining assets,
reconcile claims against the estate, and make the appropriate
distributions to creditors.  As part of its duties, the Trust
filed Omnibus Objection No. 30 (Substantive) and Motion to Reduce
or Reclassify Certain Claims on March 30, 2007.  Among the claims
to which the Trust objected was a claim filed by Loudoun for
lease rejection damages in the amount of $2,324,324.16.  The

---

[3]  Thereafter, FLYi entered into a new one-year lease with
Loudoun for a small portion of the Premises.

basis of the Trust's objection was that Loudoun had sold the Premises, thereby eliminating any claim it might have to unpaid rent or other rejection damages arising after the sale.

A hearing was held on the Omnibus Objection as it pertained to the Loudoun claim on July 13, 2007. At the conclusion of the hearing, the Court requested additional briefing on the effect, under Virginia property law, of the sale of the Premises on Loudoun's claim for damages under the Lease. The parties agreed to defer an evidentiary hearing on the amount of the claim until after the Court's ruling on that legal issue. The additional briefing was concluded on September 3, 2007. On October 17, 2007, the Court issued its decision concluding that, under Virginia property law, the sale of the Premises constituted an acceptance by Loudoun of the surrender thereby eliminating any claim Loudoun might have under the Lease to rent arising after the sale date. Flyi, 377 B.R. at 144.

At the subsequent status hearing, Loudoun asserted that it was entitled (under contract law) to a claim for consequential damages (operating losses and loss of the value of the Premises) resulting from the Debtors' rejection of the Lease, in contrast to its claim for unpaid rent under property law. Loudoun stated that, to the extent necessary, it was prepared to file a motion to allow it to file a late claim (which it did that same day). The Trust opposed the relief sought. The Court allowed the parties to brief the issue of whether such a claim was viable

3

under Virginia law.  The briefs were filed on December 5 and 20, 2007, respectively.  The matter is ripe for decision.


II.  <u>JURISDICTION</u>

The Court has subject matter jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 & 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), & (O).


III. <u>DISCUSSION</u>

A.  <u>Amended as Opposed to New Claim</u>

The Trust argues, preliminarily, that the relief Loudoun seeks under state law for contractual damages is an entirely new claim which is barred by the claim bar date that passed more than eighteen months ago.  Consequently, it contends that the Court should deny Loudoun's Motion for Leave to File Proof of Claim out of Time and limit Loudoun's claim to unpaid rent arising prior to the sale of the Premises under property law in accordance with the Court's October 17 decision.

To determine whether the claim asserted by Loudoun now is a new one, it is necessary to examine the proof of claim filed and the arguments made by Loudoun, both initially and at present. The original proof of claim on its face states that it is for "Lease rejection damages" and recites the amount claimed ($2,324,324.16).  Attached to the proof of claim is a copy of the

4

Lease and its amendment.  Loudoun also attached a calculation of
the claim as capped by section 502(b)(6) of the Code.[4]

The claim recently articulated by Loudoun seeks contractual
damages for breach of the Lease which it calculates as including:
(1) unpaid rent through the sale date of $1,233,355.76 plus (2)
Loudoun's operating losses for the period after the Debtors
rejected the Lease and before the Premises were sold of $646,455
plus (3) the diminution in value of the Premises (which Loudoun
asserts will be established by expert testimony) of $2,428,574
for a total rejection damages claim of $4,308,384.76.  Loudoun
agrees that the cap on rejection damages provided by section
502(b)(6) of the Code reduces its rejection damages claim to
$2,324,324.16 which is the amount of its original proof of claim.

The Court concludes that the contractural claim asserted by
Loudoun is not a new claim but is simply a different legal theory
for recovery of its claim for rejection damages.  The assertion
of a different legal theory for the same claim is not a new
claim.

> [A]llowance of a subsequent claim turns on whether the
> subsequent claim may be fairly characterized as an
> amendment of a timely filed claim or in substance a new
> claim.  The subsequent claim is an amendment if it:
> 1) corrects a defect of form in the original claim;
> 2) describes the original claim with greater
> particularity; or

---

[4]  Pursuant to section 502(b)(6) of the Code, a landlord's
claim for rejection damages is capped at the greater of one
year's rent or 15% (not to exceed three years) of the rent due
under the remainder of the lease.  11 U.S.C. § 502(b)(6) (2007).

5

       3) pleads a new theory of recovery on the facts set
       forth in the original claim.

In re McLean Indus., Inc., 121 B.R. 704, 708 (Bankr. S.D.N.Y.

1990) (citing In re G.L. Miller & Co., 45 F.2d 115, 116 (2d Cir.

1930).  Loudoun previously asserted its claim for rejection

damages based on property law; it is now asserting a claim for

rejection damages under contract law.  See, e.g., In re

Integrated Resources, Inc., 157 B.R. 66, 72 (S.D.N.Y. 1993)

(holding that claim against debtor for fraudulent inducement to

enter into guarantees arose from same facts as claim based on

guarantees and therefore was not a new claim but an amendment to

the original claim).

     The Trust argues nonetheless that even if Loudoun's claim is

an amended claim (as opposed to a new claim), it should not be

allowed because it will prejudice the estate.  The Trust

maintains that courts have disallowed amended claims if other

creditors would be unduly prejudiced by the amendment, if the

creditor did not act in good faith or the delay was not

justified.  See, e.g., Midland Cogeneration Venture Ltd. P'ship

v. Enron Corp. (In re Enron Corp.), 419 F.3d 115, 133 (2d Cir.

2005); Integrated Resources, 157 B.R. at 70; McLean Indus., 121

B.R. at 708.  The Trust notes that not only has oral argument

been heard by the Court, but a decision has been rendered on the

only legal theory espoused by Loudoun at that time and the Court

was prepared to consider evidence on the amount of the claim when

Loudoun asserted its latest theory in support of its claim.  The
Trust acknowledges, however, that even late-filed new claims may
be allowed.  <u>Enron</u>, 419 F.3d at 125.

     The Supreme Court has considered the circumstances under
which a court should permit a late-filed claim under Rule
9006(b)(1) of the Federal Rules of Bankruptcy Procedure, which
allows such claims if the failure to comply with the deadline was
the result of "excusable neglect."  <u>Pioneer Inv. Servs. Co. v.
Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 382-83 (1993).  The
Supreme Court noted that the ordinary meaning of neglect
"encompasses both simple, faultless omissions to act and, more
commonly, omissions caused by carelessness."  <u>Id.</u> at 388.  <u>See
also</u> <u>In re O'Brien Environmental Energy, Inc.</u>, 188 F.3d 116, 128
(3d Cir. 1999) ("While it is certainly relevant that the delay in
this case was due in part to this lack of care on the part of
[the creditor], the concept of excusable neglect clearly
anticipates this, i.e., neglect on the part of the one seeking to
be excused.").

     Consequently the Supreme Court in <u>Pioneer</u> concluded that
"the 'excusable neglect' standard of Rule 9006(b)(1) is not
limited to situations where the failure to timely file is due to
circumstances beyond the control of the filer."  507 U.S. at 391.
Rather, it adopted the test of the court below which considered
"the danger of prejudice to the debtor, the length of the delay
and its potential impact on judicial proceedings, the reason for

7

the delay, including whether it was within the reasonable control
of the movant, and whether the movant acted in good faith." Id.
at 395.

Courts have used a similar analysis in considering whether
to allow amended claims, although in the absence of prejudice to
other parties courts will freely allow amendment of a proof of
claim after the bar date has elapsed. Enron Corp., 419 F.3d at
133-34 ("While belated amendments will ordinarily be 'freely
allowed' where other parties will not be prejudiced, belated new
claims will ordinarily be denied, even absent prejudice, unless
the reason for the delay is compelling.").

Applying the Pioneer standard to the facts of the instant
case, the Court concludes that even if the claim asserted by
Loudoun were a new claim, and not simply an amendment of an
existing claim, any delay in asserting the claim is due to
excusable neglect.  In this case there is no danger of prejudice
to the estate because the Trust is still in the process of
objecting to claims and no distribution has yet been made to the
general unsecured creditors. See, e.g., O'Brien Environmental,
188 F.3d at 128 (finding no prejudice though plan had been
confirmed and gone effective because allowance of claim would not
require the return of any funds distributed thus far to
creditors).

Further, though Loudoun is asserting a different theory for
its claim, it does not seek to change the amount of its

originally asserted claim, which was capped at approximately $2.3 million by virtue of section 502(b)(6). Id. at 128 (in finding no prejudice where debtor had scheduled creditor in amount close to claim filed, the Third Circuit stated that "[t]his is not a case where the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated.")

The Court finds that the length of the delay, though eighteen months, is not too long in the context of this case, given that the litigation between the estate and Loudoun has been active for less than nine months.[5] See, e.g., Chemetron Corp. v. Jones, 72 F.3d 341, 350 (3d Cir. 1995) (fact that claim was filed four years after bar date and two years after plan was confirmed did not mandate conclusion that there was no excusable neglect); Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.), 62 F.3d 730, 740 (5th Cir. 1995) (finding excusable neglect though delay was six to eight months because debtor had contributed to delay by negotiating with claimant during that period).

The reason for the delay, according to Loudoun, is that it believed its property claim to be the easiest to assert and to win.  The Trust asserts that because Loudoun raised, but did not press, the contract theory at the July hearing, that claim has been waived or rejected by the Court in its decision.

---

[5]  Although the omnibus objection was filed on March 30, 2007, the matter concerning the Loudoun claim was continued and only first argued before the Court on July 13, 2007.

9

The Court disagrees with the Trust.  At the July hearing, the parties' argument and the Court's discussion was focused on the property law issue: whether the sale of the Premises constituted acceptance of the surrender sufficient to cut off Loudoun's claim for future rent.  (H'rg Tr. 32, July 13, 2007.) This is the issue that the Court asked the parties to brief, which they did.  Therefore, the Court concludes that any delay by Loudoun in asserting the contract claim is not unreasonable or done in bad faith and will cause no prejudice to the estate. Therefore, the Court will consider the merits of Loudoun's contract claim.[6]

B.   <u>Right to Recovery under Contract Theory</u>

Loudoun argues that it is entitled to consequential damages suffered by it as a result of the rejection of the Lease by the Debtors.  In support, Loudoun cites a case interpreting Maryland law.[7]  <u>Circuit City Stores, Inc. v. Rockville Pike Joint Venture Ltd. P'ship</u>, 829 A.2d 976 (Md. 2003).  In the <u>Circuit City</u> case, the anchor tenant had vacated the premises in breach of the lease.  <u>Id.</u> at 977.  The landlord took possession and, in obtaining another tenant, agreed to demolish the building and

---

[6]  The Court's decision should not, however, be taken as an endorsement of the tactic of presenting serial arguments. Obviously, it would have been preferable (as well as less costly and time-consuming) for Loudoun to present all of its claims and legal theories at one time.

[7]  The parties have acknowledged that Maryland and Virginia laws are similar.  <u>Flyi</u>, 377 B.R. at 143.

build a larger building.  The _Circuit City_ Court held that a

"survival clause" in the lease gave the landlord the right to

terminate the lease (as the landlord did by accepting surrender

of the premises and demolishing it) and still sue the tenant for

breach of contract.  _Id._ at 989.  As explained by the _Circuit_

_City_ Court:

> When there is a surrender of the lease, the
> landlord becomes free of the tenancy and may again deal
> with the property unfettered by it.  On the other hand,
> because a surrender terminates the tenancy, the
> tenant's obligation to pay rent ceases.  To gain the
> advantage of a surrender but avoid that consequence,
> landlords began to insert in leases provisions similar
> to that contained in paragraph 24 of the lease here,
> making the tenant liable for the amounts of rent
> reserved in the lease, notwithstanding any entry or
> termination by the landlord upon the tenant's default,
> and to rely on contract law, rather than property law,
> for the enforcement of that obligation.  That, in turn,
> rests on the proposition, that we have embraced, that a
> lease is both a contract and a conveyance of a
> leasehold estate in land, that, as such, it creates
> between the parties both privity of contract and
> privity of estate, and that, as a result, "the
> obligations which the parties bear to each other may
> arise out of contract or from the real covenants of the
> leasehold estate, or sometimes from both."

_Id._ at 989 (citations omitted).

Loudoun had asserted, in its prior brief, that the Lease

contains a similar provision.[8]  Paragraph 21G of the Lease

provides that:

---

[8]  Loudoun's prior argument was that the provision was an
agreement to "contract around" the effect of property law that
acceptance of surrender negated the tenant's obligation to pay
future rent.  The Court rejected that argument, concluding that
it merely paralleled the common law of property rights and did
not create any new rights.  _Flyi_, 377 B.R. at 145.

> Nothing herein contained shall limit or prejudice the
> right of Landlord to provide for and obtain as damages
> by reason of any such termination of this Lease or of
> possession an amount equal to the maximum allowed by
> any statute or rule of law in effect at the time when
> such termination takes place, whether or not such
> amount be greater, equal to or less than the amounts of
> damages which Landlord may elect to receive as set
> forth above.

(Lease at ¶ 21G.)

In the context of Loudoun's argument that this provision

preserves a right to sue for contract damages, rather than

"contracts around" the effect of property law, the Court agrees.[9]

---

[9]     Loudoun also argues that even if Virginia law provides
that a landlord has no claim (under property or contract
theories) if it accepts surrender of the property, the Bankruptcy
Code nonetheless provides the landlord with a claim for rejection
damages as calculated by section 502(b)(6), which takes
precedence over state law under the Supremacy Clause of the
United States Constitution.  See, e.g., City Bank Farmers Trust
Co. v. Irving Trust Co., 299 U.S. 433, 441 (1937) (concluding
that predecessor section to section 502(b)(6) took precedence
over state law which eliminated a landlord's claim if it accepted
the debtor's surrender of the property); In re McLean Enters.,
Inc., 105 B.R. 928, 933 (Bankr. W.D. Mo. 1989) ("Applying the
doctrine of surrender would have the effect of allowing state law
to supersede section 365(g)(1), which treats the rejection as a
breach and not a waiver of claims.  Given this inconsistency
between Minnesota surrender law and section 365, the Supremacy
Clause prohibits this Court from allowing state law to modify or
change the effect of rejection under section 365."); In re
Andover Togs, Inc., 231 B.R. 521, 543 (Bankr. S.D.N.Y. 1999)
(rejecting debtor's contention that landlord's re-entry
constituted acceptance of surrender of the premises under New
York law thereby precluding any rejection damages claim because
"[a]pplication of the doctrine of surrender and acceptance would
have the effect of allowing state law to supersede bankruptcy
law, thereby violating the Supremacy Clause.").  Because the
Court concludes that Loudoun has a contract claim in addition to
its property claim, it is not necessary to address the
constitutional issue.

C.    <u>Calculation of Contract Damages</u>

Loudoun asserts that it is entitled to consequential damages for the Debtors' breach of contract, including: (1) unpaid rent from the rejection of the Lease until the sale of the Premises, (2) Loudoun's operating losses during that same period, and (3) the diminution in the value of the Premises between the rejection and sale date.

The Trust does not quarrel with Loudoun's first claim (though the amount has still to be determined).  It does, however, dispute Loudoun's entitlement to the second and third claims for damages.  The Trust notes that consequential damages may be awarded only if they were reasonably foreseeable at the time the contract was executed.  <u>See, e.g.</u>, <u>Virginia Polytechnic Institute and State University v. Interactive Return Service, Inc.</u>, 595 S.E.2d 1, 7 (Va. 2004) (noting that consequential damages for breach of contract "are compensable only if it is determined that the special circumstances were within the 'contemplation' of both contracting parties.") (citations omitted).

The Court agrees that there is a serious question whether the second and third claims asserted by Loudoun are allowable as consequential damages in this case.  The second claim for relief (the alleged operating losses suffered by Loudoun) is not allowable because it is subsumed in the first claim for relief (the unpaid rent for the same period).  There was no obligation

13

of the Debtors under the Lease to cover Loudoun's operating
costs; their only contractual obligation was to pay rent.
Presumably the rent being charged by Loudoun to the Debtors was
sufficient to cover Loudoun's operating costs.  Therefore, the
allowance of a claim for unpaid rent is sufficient to give
Loudoun its expectancy under the Lease.

The case cited by Loudoun in support of the claim for
operating losses is easily distinguishable from the instant case.
See, e.g., McLean Enters., 105 B.R. at 933.  In that case, the
landlord had leased a Howard Johnson motor lodge to the debtor
with a percentage of the gross revenues due as rent.  Id. at 929.
When the lease was rejected, the landlord was required to operate
the business (at a loss) until a buyer could be found.  Id. at
929-30.  The McLean Enters. Court found that the landlord's
damages were the loss of the rent it had previously received plus
the operating losses it suffered while operating the business.
In this case, Loudoun was not obligated to continue to operate
the Debtors' business at the Premises and incurred no operating
losses as a result.  Instead, Loudoun's only contractual damages
are the loss of rent the Debtors were obligated to pay it for the
period from the rejection of the Lease to the sale of the
Premises.

Loudoun also claims that it is entitled to more than $2.4
million for the diminution in value of the Premises caused by the
rejection of the Lease by the Debtors.  See, e.g., BVT Lebanon

14

<u>Shopping Center, Ltd. v. Wal-Mart Stores, Inc.</u>, 48 S.W.3d 132,
135-36 (Tenn. 2001) (concluding that "[c]ommon sense dictates
that an award based solely on the value of lost future rent fails
to consider other economic losses suffered by a shopping center
owner/lessor when its anchor tenant abandons occupancy.");
<u>Pleasant Valley Promenade v. Lechmere, Inc.</u>, 464 S.E.2d 47, 62
(N.C. Ct. App. 1995) (holding that "diminution in market value
may be applied to redress breach of contract occurring between an
anchor store and the shopping center within which it resides.");
<u>Hornwood v. Smith's Food King No. 1</u>, 772 P.2d 1284, 1286 (Nev.
1989) (concluding that diminution in value of shopping center was
foreseeable damage resulting from anchor tenant's breach of
continuous use obligation).

The Trust argues that Loudoun is not entitled to such a
claim because any diminution in the value of the Premises was
caused by the recent downturn in the real estate market, not by
the Debtors.  As a result, the Trust argues that a diminution in
value of the Premises was not foreseeable at the time the Lease
was executed and, therefore, cannot be awarded as consequential
damages.

The Court agrees with the Trust that it is difficult to see
any connection between the diminution in value, if any, to the
Premises and the Debtors' rejection of the Lease.  <u>See, e.g.</u>,
<u>McLean Enters.</u>, 105 B.R. at 935 ("it is difficult to ascertain
either how [the landlord] was damaged in that amount or, assuming

the value of the rental property did decline after breach of the lease, why the debtor should be liable for any such decline."). Similarly, while the <u>BVT</u> Court concluded that hypothetically a shopping center owner could obtain the diminution in value of the shopping center as consequential damages for an anchor tenant's breach of an implied covenant of continuous occupancy, it acknowledged that "factors other than loss of an anchor tenant may contribute toward the shopping center's loss in value, such as economic downturn, population shift, population decrease, or a store similar to the anchor store opening in close proximity." 48 S.W.3d at 136.  Consequently, the <u>BVT</u> Court permitted the parties to present evidence on this point at trial.  This Court agrees with that reasoning and will do the same in the instant case.


IV.  <u>CONCLUSION</u>

     For the reasons stated above, the Court will allow Loudoun to press its contract claim for consequential damages resulting from the Debtors' rejection of the Lease.  A further hearing will be scheduled to consider the amount of that claim.

     An appropriate Order is attached.


Dated: January 16, 2008          BY THE COURT:

                                 Mary F. Walrath
                                 United States Bankruptcy Judge